[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 21-13894

_____

RUBY GREEN,

                                                          Plaintiff-Appellant,

*versus*

HOWARD FINKELSTEIN,
individually, in his capacity as Public Defender for Broward County,
THE OFFICE OF THE PUBLIC DEFENDER FOR BROWARD COUNTY,

                                                          Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:20-cv-62160-BB

_____

Before WILSON, JORDAN, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal requires us to consider whether the First Amendment protects a public employee's statements attacking her supervisor during a political campaign to replace him. Ruby Green argues that former Broward County Public Defender Howard Finkelstein fired her from her position as a public defender in violation of her First Amendment rights. Finkelstein fired Green after she made public comments during her campaign to replace Finkelstein, who was not seeking reelection. Specifically, Green claimed on a political podcast that Finkelstein played golf rather than work, did not hire racial minorities or support black social justice organizations, and had used illegal drugs while practicing law earlier in his career. Based on these comments, Finkelstein terminated Green's employment after the primary election, which Green had lost to another employee of the office.

The district court granted summary judgment to Finkelstein. It concluded that many of Green's statements about Finkelstein were eligible for First Amendment protection because they were made on matters of public concern. But, balancing Green's

interests against her employer's interests, the district court concluded that her interest in making these statements did not outweigh the government's interest in the effective management of the public defender's office.

We have yet to consider whether and how a public employee's political campaign to replace her supervisor impacts her interest in criticizing that supervisor. Although we recognize that an employee seeking public office has a strong interest in criticizing the elected official currently holding that position, we believe the employer's interest in effective management outweighs the employee's interest when the employee's criticisms are likely to frustrate the employer's mission. Because we conclude that Green's criticisms of Finkelstein fit this mold, we conclude that her termination cannot support a claim for retaliation in violation of the First Amendment. We therefore affirm the judgment of the district court.

**I.**

During his fourth term as Broward County Public Defender, Howard Finkelstein announced that he was retiring and would not be running for reelection in the November 2020 primary. Ruby Green, a Broward County Assistant Public Defender, later announced her candidacy to replace him. Before Green declared her candidacy, Gordon Weekes, who served as one of three executive chiefs at the office, entered the race and received Finkelstein's endorsement. Finkelstein is white; both Green and Weekes are black.

Office policy permitted Green and Weekes to run for office while remaining employed so long as they "follow[ed] campaign laws, submit[ted] vacation requests for any campaigning during working hours, and refrain[ed] from using office computers or supplies for any campaign purpose." Finkelstein also emailed Green and Weekes, reiterating this campaign policy, and explaining that their campaigns "have the potential of pulling the office apart and distracting our employees from our very important mission." Finkelstein stressed that he "worked too hard to de-politicize [the] office to allow it to devolve into chaos before [he] retires" and that he trusted both Green and Weekes would "conduct [themselves] professionally" during the campaign.

As part of her campaign, Green appeared as a guest on a publicly disseminated podcast that discusses political issues in South Florida. On the podcast, she discussed her candidacy as well as what she believed to be issues with how Finkelstein either ran the office or conducted himself as public defender. Green's statements on the podcast fall broadly into three categories: (1) Finkelstein's present performance as a lawyer or supervisor; (2) Finkelstein's hiring of minority employees and attitudes towards social justice issues; and (3) Finkelstein's alleged drug use earlier in his career.

As for the first category, Green claimed Finkelstein told her "not to go to the courtroom, not to train [the Office's] attorneys." She claimed that Finkelstein "c[ame] to work maybe once or twice a week for maybe an hour or two" and did not "know people's names." Additionally, Green claimed that Finkelstein "hasn't had

21-13894               Opinion of the Court                    5

any cases. Hasn't had any . . . jail visits . . . any jail calls, [or] anything like that." Instead, she told the host, Finkelstein "just get[s] to go home and play golf." Finally, she stated that Finkelstein treated his employees "like trash."

As for the second category of statements, Green made several comments related to race and Finkelstein's treatment of racial issues. Green implied that Finkelstein did "not want to hire people who look . . . like the people that are filling the boxes." Further, she claimed that Finkelstein "t[old] the entire office that [the employees] can't march in solidarity with Black Lives Matter." Finally, Green claimed that Finkelstein refused to "donate or come to an event that was, you know, of blackness, . . . because . . . he was mad that some of the people in that organization called him racist."

Finally, as for the third category, Green implied that Finkelstein had used drugs earlier in his career. Comparing herself to Finkelstein, Green said, "[i]f we were drug addicts and we used to come to court with cocaine on their noses, you know, would we be able to be in a position that he would be able to be in?"

When he learned about the podcast, Finkelstein determined that Green made a series of statements that were "untruthful, personally and professionally offensive, and which had the ability to undermine and inhibit the Office relations and ability of the Office to accomplish its Mission." Finkelstein told Renee Dadowski, a supervisor in the office, and Weekes that Green had "attacked [him] professionally and personally, the office and fellow pds," and that Green's statements "ha[d] the ability to inhibit the ability to do [his]

job[]." Finally, he explained that he took specific offense because Green "lied and said [the Office] wouldn't allow people in the office to be involved with marching for [Black Lives Matter]."

Five days later, Finkelstein emailed Dadowski and Weekes outlining his plan to terminate Green. In that email, he cited Green's "disrespect for [him] personally and for the office and its lawyers." He also stated that Green's comments "[i]nhibit[] [the Office in its] ability to do [its] job," and that the comments "bring[] disrepute down on [the office] and [its] clients." Finally, Finkelstein stated that Green's "lack of truthfulness should prevent her from being a lawyer [a]s well but that is another issue for others[.]"

A few days later, on August 19, 2020, the morning after Green lost the primary election, Finkelstein terminated Green. That same day, Finkelstein told the South Florida Sun Sentinel that Green was terminated because of her "unprofessional" and "[un]truthful" statements on the podcast.

Green sued Finkelstein both in his personal and official capacity in the U.S. District Court for the Southern District of Florida. During their respective depositions, both Finkelstein and Green discussed Green's statements on the podcast and her termination at length. Regarding her comments about Finkelstein's work schedule, Green testified she did not actually know what Finkelstein did outside of work or his work hours. Regarding Finkelstein's rationale for terminating Green, he testified that he believed her comments "created a split in the office" based on race that he believed could cause lawyers in the office to avoid working with and

consulting the leadership of the office. Ultimately, he believed keeping Green on board after her comments would be like "a disease in the office." And as for the personal attacks, Finkelstein explained that there was "no way [he] could have [Green] be on [his] staff working for [him] because of the contempt [and] hatred" he believed she had for him after her statements, which included "call[ing him] an old racist that doesn't care."

After discovery, the parties filed their summary judgment motions. Finkelstein moved for summary judgment of the entire action, and Green filed a partial motion for summary judgment with respect to liability only. The district court concluded that three of Green's eight statements involved matters of public concern. But it concluded that the government's interest in the efficient administration of the office outweighed Green's interest in making the statements. Accordingly, the court denied Green's motion and granted Finkelstein's.

Green timely appealed.

## II.

We review *de novo* the resolution of cross-motions for summary judgment. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). We "apply[] the same legal standards as those that control the district court." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). To succeed on a summary judgment motion, the movant must show he is entitled to prevail on questions of law, and "that there are no genuine issues

of material fact pertinent to those questions of law." *Rich v. Dollar*, 841 F.2d 1558, 1562 (11th Cir. 1988).

### III.

A citizen does not surrender her First Amendment rights by accepting a position as a public employee, but a public employee's right to speak as a private citizen is not absolute. Determining whether the First Amendment protects the speech of a public employee requires "a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of . . . an employer[] in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks*, 573 U.S. 228, 231 (2014) (first alteration in original) (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968)).

Applying this test, we have held that, to prevail on a First Amendment claim of unlawful retaliation, an employee must make three showings. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565–66 (11th Cir. 1989). First, the employee must show that the speech was made as a citizen on a matter of public concern. *Id.* Second, the employee's free speech interest must outweigh the employer's interest in effective and efficient fulfillment of its responsibilities. *Id.* And third, the speech must have played a substantial part in the adverse employment action. *Id.* The first two inquiries are questions of law for the court. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 617-18 (11th Cir. 2015).

Here, it is undisputed that Finkelstein fired Green because of her speech. But the parties dispute which of Green's statements, if any, involved matters of public concern and whether Green's interest in making those statements outweighed Finkelstein's interest in promoting the effective fulfillment of the public defender's responsibilities.

## A.

Turning to the first disputed issue, we must determine which of Green's statements, if any, are eligible for First Amendment protection. An employee's speech is protected only when made as a citizen and "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted). To determine whether speech is made as a citizen on a matter of public concern, we must examine "the content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

As an initial matter, there is no dispute that Green was speaking as a citizen, not an employee, when she was critical of Finkelstein and the office. When an employee makes "statements pursuant to [her] official duties," the First Amendment "does not insulate [her] communications from employer discipline." *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006) (quotation omitted) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). But "the mere fact that a citizen's speech concerns information acquired by virtue of [her] public employment does not transform

that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240. Indeed, "speech by public employees on subject matter related to their employment holds special value [to the public] precisely because those employees gain knowledge of matters of public concern through their employment." *Id.* Here, Green appeared on the podcast in her personal capacity, as a candidate for public office, and not as a representative of the public defender's office or a lawyer representing a client. She was, therefore, speaking as a citizen, not a public employee, when she criticized Finkelstein.

We now turn to the content, form, and context of Green's statements to determine whether they can be "fairly considered as relating to any matter of political, social, or other concern to the community," or "a subject of legitimate news interest." *Snyder*, 562 U.S. at 453. Finkelstein argues that most of Green's statements were "personal concerns of her own employment" and not on matters of public concern. For its part, the district court held that three statements were directed to matters of public concern: that Finkelstein (1) would not hire minority employees; (2) would not allow employees of the office to march in support of the Black Lives Matter movement; and (3) did not support black organizations. But the district court concluded that five of Green's statements are not on matters of public concern: (1) regarding the office not allowing her to "go to the courtroom" and "train attorneys"; (2) that Finkelstein treated employees like "trash"; (3) criticizing Finkelstein's work schedule; (4) suggesting Finkelstein's prior drug use, and (5) implying that Finkelstein was not "in the trenches."

21-13894               Opinion of the Court                    11

We think all of Green's statements were sufficiently directed to matters of public concern to warrant protection under the First Amendment. Although the *content* of some of Green's statements may be akin to an employee grievance when read in isolation, we cannot ignore that these statements were made in the *form* of a publicly disseminated political podcast in the *context* of a campaign for elected office. In light of this form and context, we ultimately conclude that Green's statements were made on matters of public concern.

Starting with content, we have little trouble concluding that the content of at least some of these statements suggests they are on matters of public concern. Like the district court, we recognize that Green's allegations that Finkelstein had racially discriminatory hiring practices and forbade employees from participating in race-related protests raise matters of public concern. Our law recognizes that public employers "must act in accordance with a 'core purpose of the Fourteenth Amendment' which is to 'do away with all governmentally imposed discriminations based on race.'" *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)). *See also* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e17 (as amended); Unlawful Employment Practices, Fla. Stat. § 760.10(1)(a) (2023). Likewise, the Supreme Court has held that public employers cannot condition employment on an employee's political affiliation. *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980); *see also Terry v. Cook*, 866 F.2d 373, 377 (11th Cir. 1989). Green's allega-

tions that Finkelstein was violating these constitutional and statutory commands—not only as to herself, but with respect to other members of the office—resemble allegations "[e]xposing governmental . . . misconduct," which "is a matter of considerable significance" under the First Amendment. *Garcetti*, 547 U.S. at 425.

On the other hand, we agree with Finkelstein that the content of many of Green's other statements is more personal in nature. In particular, Finkelstein's supposed instructions to Green not to train junior public defenders and her allegation that he treated office employees "like trash" are akin to private employee grievances. Although these statements have some public import because Green was a government employee complaining about her elected boss, "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986).

Nonetheless, despite the content of these statements, we believe their form and context establish that they addressed matters of public concern and legitimate news interest. Green made these statements on a political podcast (form) as a candidate campaigning for public office (context). Even if the content of some of her statements are not newsworthy when read in isolation, the form and context of these statements establish that they are eligible for First Amendment protection.

Turning to the form of these statements, we cannot overlook that Green made these allegations during an interview on a

news and politics podcast. Our First Amendment retaliation precedents have not often delineated what differentiates the *form* of a public employee's speech from its *context*. *See, e.g.*, *Lane*, 573 U.S. at 241 (simultaneously analyzing the form and context of the speech). But the most heavily emphasized factor when considering the form of a public employee's speech has been whether, and how, the speech was disseminated to the public. *See Abdur-Rahman v. Walker*, 567 F.3d 1278, 1285 (11th Cir. 2009) ("[P]ublic employees 'retain some possibility of' constitutional protection when they "make public statements . . . ." (quoting *Garcetti*, 547 U.S. at 423–24)). Indeed, publicly disseminated speech lies at the very core of the right to openly criticize one's employer that the Supreme Court recognized in *Pickering*.

Although no direct analog exists in our precedents, we see no reason why statements made during an interview on a publicly disseminated podcast would not be afforded First Amendment protection. *See Lane*, 573 U.S. at 240 ("The critical question . . . is whether the speech at issue is itself ordinarily within the scope of the employee's duties, not whether it merely concerns those duties."). Appearing on a podcast is the modern-day equivalent of the letter-to-the-editor that the Supreme Court analyzed in *Pickering*. *Compare* Audio and Podcasting Fact Sheet, Pew Research Center (June 15, 2023) (showing the percentage of podcast listeners increasing by more than 100% since 2008)[1] *with* Newspapers Fact

---

[1] https://www.pewresearch.org/journalism/fact-sheet/audio-and-podcasting/ [https://perma.cc/F4RG-4VU4].

Sheet, Pew Research Center (June 29, 2021) (showing sharp declines in newspaper readership).[2] Green's speech is comparable to cases in which a public employee "seek[s] to inform the public that [a government] office was not discharging its governmental responsibilities," or where the employee "seek[s] to bring to light actual or potential wrongdoing or breach of public trust on the part of [a public official]." *Connick*, 461 U.S. at 148. *See, e.g., Watters v. City of Philadelphia*, 55 F.3d 886, 892-93 (3d Cir. 1995) (statements made to newspaper reporter, by director of police department's employee assistance program, about lack of formal written policies was speech on a matter of public concern). Accordingly, the form of Green's speech—an interview on a publicly disseminated news and politics podcast—supports a conclusion that her statements involve matters of public concern.

Lastly and perhaps most importantly, the context of Green's statements—a campaign for elected office in which she was a candidate—underscores that her statements were of legitimate news interest. Under the context factor, we consider the constitutional protections afforded to the specific category of speech at issue. For instance, in *Lane*, the Supreme Court emphasized that the statements at issue were made in the context of a judicial proceeding, which may form the basis for government action and "affect[] the rights and liberties of others." 573 U.S. at 238 (quoting *United States*

---

[2] https://www.pewresearch.org/journalism/fact-sheet/newspapers/ [https://perma.cc/7DZ6-3RKP].

*v. Alvarez*, 132 S. Ct. 2537, 2546 (2012) (plurality opinion)). Likewise, in *O'Laughlin v. Palm Beach County*, when examining the context of statements made during a union election, we recognized that "air[ing one's] grievances in the run-up to [an] election," "arguably strengthens" an employee's First Amendment retaliation claim. 30 F.4th 1045, 1052–53 (11th Cir. 2022). We reached this conclusion because "campaign-related speech exists at the very core of the First Amendment." *Id.* at 1053 (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995)).

Our reasoning in *O'Laughlin* applies equally here. Whatever their specific content, it is undisputed that Green made these statements to the public in the context of a campaign for elected office in which she was a candidate. And "the right of candidates for political office to make their case to the American people" is among "the most fundamental First Amendment activities." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1654 (2022). It is difficult to imagine a context with a more direct implication for the public interest. Political speech, especially a candidate's statements on the campaign trail, "'is the essence of self-government.'" *Snyder*, 562 U.S. at 452 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). These "expressive activities constituted the type of 'classically political speech' lying at the 'core of the First Amendment.'" *Carter v. City of Melbourne*, 731 F.3d 1161, 1169 (11th Cir. 2013) (quoting *Boos v. Barry*, 485 U.S. 312, 318 (1988)). To deny a candidate's campaign-related statements any First Amendment protection would give public employers free rein to censor an employee's political speech.

But the Supreme Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *Republican Party of Minn. v. White*, 536 U.S. 765, 782 (2002). We therefore decline Finkelstein's invitation to declare most of Green's campaign-related interview to be unprotected speech.

In short, we believe all of Green's statements on the podcast were made as a citizen on matters of public concern. The content of several of her statements—that the office's hiring practices were racially discriminatory, for example—were clearly newsworthy. As for other statements, we believe the context and form—made by a candidate for elected office on a political podcast disseminated to the public during a campaign—make them newsworthy and addressed to matters of public concern.

### B.

Of course, our conclusion that Green's statements are eligible for First Amendment protection says nothing about the government's countervailing interest in terminating her. As both we and the Supreme Court have recognized, governments have important interests that may justify precluding a public employee from campaigning or electioneering. *See United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 96 (1947) (upholding the Hatch Act, 5 U.S.C. § 7323, which restricts federal employees from participating in political campaigns); *see also Randall v. Scott*, 610 F.3d 701, 714 (11th Cir. 2010) (reasoning that running against a sitting district attorney

would qualify as a "good legal reason to discharge" a public employee "due to the state's interest in office loyalty"). To that end, *Pickering* requires us to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of . . . an employer[] in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. The key question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418.

Finkelstein argues that Green's termination was justified because her statements were likely to impede the functioning of the public defender's office. He testified that he believed keeping Green on board after her comments would be like "a disease in the office." Green responds that there are genuine issues of material fact that preclude summary judgment. But we agree with Finkelstein. We conclude that the government's interests outweigh Green's for three reasons.

First, some of Green's statements amount to baseless, unfounded, or demonstrably false attacks on Finkelstein and should be afforded little—if any—weight under *Pickering*. We have held that the "First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack, simply because the employee recently has waved a political sign." *Morris v. Crow*, 117 F.3d 449, 458 (11th Cir. 1997). Likewise, the Su-

preme Court has emphasized that "proof of false statements knowingly or recklessly made by" a public employee can "furnish the basis for his dismissal from public employment." *Pickering*, 391 U.S. at 574. *See also Lane*, 573 U.S. at 238 (emphasizing that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is" protected by the First Amendment (emphasis added)).

It is undisputed that several of Green's statements are false or, at the very least, baseless. Green testified during her deposition that she did not know what Finkelstein did outside of work (i.e., she was not aware if he was playing golf as she claimed), and her claims about his hours were based on how often she would personally see him at the office. The same can be said of Finkelstein's supposedly discriminatory hiring practices. Green has not presented any evidence that that Finkelstein did "not want to hire people who look . . . like the people that are filling the boxes." In fact, the record reflects that a portion of Finkelstein's selected office leadership was black and Finkelstein, as public defender since 2004, hired a number of minority attorneys—including Green herself. Although the hiring and promotion of minority attorneys does not necessarily establish that the office did not engage in any discriminatory hiring practices, we see little value in making a thoughtless charge of racism against one's supervisor.

Second, as a lawyer, Green held a position of trust in the office, and she lost that trust when she so harshly criticized the of-

fice's management. We have recognized that a "government employer's interest in staffing its offices with persons the employer fully trusts is given great weight when the pertinent employee helps make policy, handles confidential information or must speak or act—for others to see—on the employer's behalf." *Shahar v. Bowers*, 114 F.3d 1097, 1103–04 (11th Cir. 1997). Put another way, the "First Amendment does not require that an official . . . nourish the viper in the nest." *Carver v. Dennis*, 104 F.3d 847, 853 (6th Cir. 1997). As an attorney, Green was in a unique position in that she acted as both a representative of her client and the public defender's office itself. An attorney's perceived disloyalty provides "good legal reason to discharge" her "due to the [government's] interest in office loyalty." *Randall*, 610 F.3d at 714. Because of Green's position as an attorney, Finkelstein's contention that he had lost trust in Green because of her comments is an especially substantial justification for terminating her.

Third, there is ample evidence in the record that Finkelstein terminated Green due to his concerns over office harmony. Finkelstein's emails to his colleagues rely on this rationale. Finkelstein also testified that Green's statements "created a split in the office" based on race. When an employer determines that an employee's speech has a "detrimental impact on close working relationships or destroys harmony among coworkers," we must give "'a wide degree of deference to the employer's judgment.'" *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988) (quoting *Connick*, 461 U.S. at 151–52). Affording that deference, Finkelstein's position strikes

us as reasonable: publicly accusing a supervisor of being a lazy, racist, former drug addict is likely to affect office harmony.

For her part, Green argues that Finkelstein's justification is insufficient because he could not identify any specific disruption that her statements caused. We disagree. Both we and the Supreme Court "have given substantial weight to government employers' *reasonable predictions* of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (emphasis added). It is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. The obvious disruptive potential of Green's statements, the fact that Finkelstein's decision to terminate Green was based on these potential disruptions, and the deference our precedents require, all support a conclusion that the government's interests outweigh Green's.

In short, we cannot say that Green's interest in making these statements outweighs the government's interest "in promoting the efficiency of the public services [the office] performs through its employees." *Pickering*, 391 U.S. at 568. Because the undisputed facts warrant a conclusion that the government's interest in terminating Green outweighed her interest in making the statements for which she was terminated, the district court did not err in denying Green's motion for summary judgment and granting Finkelstein's.

## IV.

The judgment of the district court is **AFFIRMED**.